# Illinois Official Reports

## Appellate Court

---

**Holloway v. Sprinkmann Sons Corp. of Illinois, 2014 IL App (4th) 131118**

---

| | |
|---|---|
| Appellate Court Caption | CAROL HOLLOWAY, Plaintiff-Appellant, v. SPRINKMANN SONS CORPORATION OF ILLINOIS, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-13-1118 |
| Filed | December 16, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for negligence arising from claims that defendant delivered asbestos-containing insulation that was installed in the factory where plaintiff worked and later caused plaintiff to develop asbestosis, and alternatively, spoliation of evidence based on the wrongful destruction of documentary evidence regarding the delivery of the insulation, the denial of plaintiff's motion for a new trial based on the violation of an order *in limine* was not an abuse of discretion and the verdict for defendant was affirmed, since plaintiff did not seek a new trial based on a violation of the order *in limine* but, rather, sought a default judgment on the issue of liability, thereby forfeiting the alleged violation of the order *in limine* as a ground for a new trial, and as to the other claims, plaintiff offered only speculation that her asbestosis was the result of repair work on the insulation used to cover the pipe in the factory where she worked, the jury could have reasonably found against plaintiff on the issue of causation, and the jury could have concluded that the destroyed records would have made no difference in plaintiff's case, especially when those records did not address the issue of causation. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 07-L-183; the Hon. Rebecca Simmons Foley, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Lisa Corwin (argued), of Wylder Corwin Kelly LLP, of Bloomington, for appellant.

Cathy A. Molchin (argued), of Cathy A. Molchin, P.C., of Mapleton, and Michael D. Martinez, of Matushek, Nilles & Sinars, L.L.C., of Chicago, for appellee.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices Knecht and Turner concurred in the judgment and opinion.

**OPINION**

¶ 1 Plaintiff, Carol Holloway, brought a negligence action against defendant, Sprinkmann Sons Corporation of Illinois, alleging that defendant's asbestos-containing insulation had caused her to develop asbestosis. Alternatively, she sought to recover from defendant on a theory of spoliation of evidence. The jury returned a verdict in defendant's favor, and the trial court denied plaintiff's motion for a new trial. Plaintiff appeals.

¶ 2 We do not find the verdict to be against the manifest weight of the evidence. Nor do we find an abuse of discretion in the denial of plaintiff's motion for a new trial. Therefore, we affirm the trial court's judgment.

¶ 3                     I. BACKGROUND
¶ 4             A. Plaintiff's Claims Against Defendant:
                  Negligence and Spoliation of Evidence
¶ 5 In her complaint, plaintiff raised essentially two claims against defendant. The first was a claim of negligence. According to this claim, defendant sold and delivered asbestos-containing insulation to the Eureka vacuum-cleaner factory in Bloomington, Illinois, either before or during the time plaintiff worked in the factory, and the insulation was installed on steam pipes throughout the factory. Plaintiff accused defendant of negligence in that this product, the insulation, was unaccompanied by any warning–or the product was too dangerous to sell even with a warning. She alleged that from 1962 to 1976, when she worked in the Eureka factory, she unknowingly breathed asbestos fibers from the pipe-covering insulation and that, after a latency period, these fibers, trapped in her lungs, caused her to develop asbestosis.

¶ 6 The second claim, pleaded in the alternative, was that defendant had wrongfully destroyed documentary evidence that plaintiff needed to prove her case. According to this claim, defendant had internal accounting procedures, pursuant to which it routinely recorded the types of insulation it sold and delivered to each of its customers: both the customers who thereafter installed the insulation themselves and the customers who hired defendant to do the

installing. In approximately 1981, defendant destroyed these records, even though claims already had been brought against defendant for asbestos-related diseases and death. Plaintiff alleged that when destroying these records, defendant foresaw that people would continue to become ill from the asbestos-containing insulation defendant had distributed and installed and that they would file claims against defendant and others. According to plaintiff, defendant had a duty to preserve these records, which it knew, or should have known, would be relevant to potential civil actions. "If Defendant would not have destroyed the records," the complaint said, "Plaintiff would be able to document the sales of products Defendant made for installation by others, and the sale and delivery of products used in the course of installation by others, and the sale and delivery of products used in the course of insulation work performed by Defendant." The complaint continued: "As a result of Defendant's spoliation of evidence, Plaintiff is unable to produce evidence demonstrating what asbestos containing products were sold and delivered by Defendant where [plaintiff] worked."

¶ 7                                 B. The Pretrial Order *in Limine*

¶ 8        On September 21, 2009, defendant filed a motion *in limine*. On the authority of *Nolan v. Weil-McLain*, 233 Ill. 2d 416 (2009), the motion sought a ruling that the following evidence would be *admissible* in the trial: evidence of plaintiff's exposure to asbestos-containing products manufactured, sold, or distributed by nonparties–that is, by entities other than defendant.

¶ 9        On October 26, 2009, plaintiff filed a motion *in limine* on the same subject. She sought to *bar* the evidence that defendant wanted to present. She sought to bar any reference that she had been exposed to asbestos-containing products sold by anyone other than defendant.

¶ 10       On March 29, 2013, the trial court denied defendant's motion *in limine* and granted plaintiff's motion *in limine*.

¶ 11                                C. The Opening Statements and
Defendant's Violation of the Order *in Limine*

¶ 12       On April 10, 2013, the attorneys made their opening statements to the jury.

¶ 13       In her opening statement, plaintiff's attorney, Lisa Corwin, told the jury that asbestos fibers were toxic and caused disease when they were inhaled. She anticipated that a medical expert, Arthur Frank, would testify there was no such thing as an innocuous exposure to asbestos. Corwin said:

> "You're *** going to hear from Dr. Frank that there is no safe level of exposure to asbestos fibers. Every exposure that you get increases the risk of getting disease. There's no such thing as being exposed to fibers at an amount that are [*sic*] trivial or that don't [*sic*] affect your health. Every exposure increases your risk of developing disease."

¶ 14       Corwin explained that a person did not even have to work hands-on with asbestos products to be endangered by asbestos fibers: asbestos fibers released from a distant source could travel through the air and drift to the floor and be set adrift again by, say, a passing forklift.

¶ 15       Next, defendant's attorney, Kathy Molchin, made her opening statement to the jury. She predicted that plaintiff's claim against defendant would be unproven, since no one would testify that plaintiff had been near any work on steam pipes in the Eureka plant. Molchin said:

"[Plaintiff] is *** claiming that her asbestosis was caused by exposure to asbestos insulation installed by [defendant] at the Eureka plant. But you will also hear from her own lips that she doesn't know who [defendant] is. She will also testify further that she doesn't even recall any outside insulation contractors working at Eureka when she was there. She doesn't remember anything about the pipes in the building either. You will not hear from any of the witnesses that [defendant's] insulators worked or installed pipe covering anywhere near where [plaintiff] worked."

¶ 16    In summary, Molchin told the jury:

"So the two issues that we will have in this case is whether [plaintiff] was exposed to an asbestos product sold or installed by [defendant] at the Eureka plant. You will also hear testimony from [plaintiff] as to what one of her job duties was at the Eureka plant, *and one of her job duties was to stuff grenades with asbestos*." (Emphasis added.)

¶ 17    Corwin objected, and the trial court removed the jury from the courtroom. Corwin argued that the reference to stuffing grenades with asbestos was a clear violation of the order *in limine* (presumably because defendant had not supplied the asbestos with which the grenades were stuffed).

¶ 18    Molchin responded:

"MS. MOLCHIN: Judge, I don't think I am in violation. First of all, [plaintiff] in her deposition testimony said that was one of her jobs. How are we not going to discuss the work that she did at Eureka without discussing the jobs that she did, and that was one of them, and that's in her deposition testimony. And Ms. Corwin, during her opening statement, was talking about, you know, the cumulative effect of an asbestos exposure. How can we not talk about her very job at the Eureka plant?"

¶ 19    Corwin replied that stuffing grenades with asbestos could not be talked about because the order *in limine* forbade its being talked about.

¶ 20    The trial court asked Corwin what she wanted the court to do about Molchin's violation of the order *in limine*. Corwin answered:

"MS. CORWIN: The plaintiff moves for a default judgment on everything other than damages in this case. The reasoning behind that is, number one, if we move for a mistrial at this point, I think that benefits Sprinkmann. The Court will recall Sprinkmann is not eager to be here in this courtroom. There has already been a determination by Sprinkmann's experts that they're unavailable to attend, which makes it even less desirable for Sprinkmann to be here. They filed a motion to continue that was denied by the Court. ***

A mistrial in this case would actually benefit Sprinkmann. My jury consultant is already on a plane and has already left. We have an expert who is already here from Philadelphia who is not available next week. So rescheduling of experts and all of that to try to start all over again with a jury is prejudicial to my client, and I am not asking for a mistrial. So that leaves us with a sanction of default or simply a limiting instruction."

¶ 21    In Corwin's view, a limiting instruction would be ineffectual. It would be like "throwing a skunk in the jury box and telling the jurors to ignore the smell." The only fitting sanction, she argued, was a default on all issues other than damages. "That's what I'm asking the Court for,"

she said, "an instruction to the jury that this case is now down to a single issue, it's just the damages issue, and that I be allowed to call witnesses on the damages issue, and that the jury still be allowed to deliberate and return a verdict in this case."

¶ 22 Molchin responded that a default on the issue of liability would be a draconian sanction, considering that she had believed, in good faith–and still believed–that Corwin had opened the door to the grenade-stuffing in her own opening statement, by saying that no exposure to asbestos could be exonerated.

¶ 23 Corwin denied she had opened the door by so much as a crack. Besides, Corwin argued, if Molchin believed the door had been opened, she should have approached the bench and made that argument to the judge, outside the hearing of the jury, instead of taking it upon herself to assume the order *in limine* was superseded.

¶ 24 The trial court agreed that the better practice by Molchin would have been to seek guidance and clarification from the court instead of unilaterally blurting out the grenade-stuffing to the jury. The court also agreed that the reference to the grenade-stuffing violated the order *in limine*. Nevertheless, the court was unconvinced that Molchin had deliberately attempted to sabotage the trial. Therefore, the court denied plaintiff's motion for a default judgment and decided instead to give a curative instruction.

¶ 25 The jury returned to the courtroom, and the trial court instructed the jury:

"Ladies and gentlemen, the last objection made by plaintiff's counsel was sustained. You are instructed to disregard the last statement made by Ms. Molchin during the course of her opening statement as you will hear no evidence and you will hear no testimony in this case to that [e]ffect. As to that statement, you are not to consider it in any manner during your consideration of this case or in arriving at your verdict."

¶ 26                                D. The Testimony of Arthur Frank
¶ 27                                    1. *His Qualifications*
¶ 28 All the witnesses in the trial were called by plaintiff. The first witness, Arthur Frank, testified he was a medical doctor, board certified in both internal and occupational medicine, and that he also had a Ph.D. in biomedical sciences. He had earned this Ph.D. by doing original research on the effects of asbestos on respiratory tissue–a line of research he had been pursuing for 45 years. He had published over a hundred papers and book chapters on asbestos. He had examined and treated thousands of people exposed to asbestos. He currently was a professor at Drexel University, in Philadelphia, where he was the head of the department of environmental and occupational health.

¶ 29                        2. *The Known Dangers of Asbestos in the 1960s*
¶ 30 Frank testified that in 1962 (when plaintiff began working in the Eureka plant) there were hundreds of published articles about the dangers of asbestos. It was clear, from these articles, that workers could contract respiratory diseases, such as asbestosis, even if they themselves never worked hands on with an asbestos-containing product but instead were merely exposed to asbestos fibers drifting in from another area of the factory. This was called "bystander exposure."

¶ 31     Microscopic asbestos fibers–invisible, odorless, and tasteless–stayed around for a long time and could easily be set afloat again after settling on the floor or some other surface. The fibers were so small and light that air currents could carry them a long way. It was a documented fact that people living half a mile away from asbestos factories had contracted asbestos-related diseases.

¶ 32     The same thing happened to people occupying houses formerly occupied by asbestos workers. The asbestos workers had carried in asbestos fibers on their clothing, and the fibers remained in the house, and made the new occupants sick, even after the asbestos workers moved out. Frank testified: "[W]e found that[,] even among these people who moved in afterwards[,] when no new asbestos was coming into the house, fifteen percent of those people in those homes were coming down with asbestosis."

¶ 33                                    3. *Asbestosis*

¶ 34     Frank testified that asbestos could cause a number of different diseases. It could cause asbestos warts on the fingers. It could cause cancer, such as lung cancer and mesothelioma. It also could cause asbestosis, a noncancerous, though potentially fatal, respiratory disease.

¶ 35     Frank explained that the lung was a collection of about 2 billion air sacs and that asbestos fibers, when inhaled, got down into these air sacs and caused asbestosis: a permanent, incurable scarring visible in an X-ray. Not only the lungs were scarred, but the tiny, indestructible fibers also worked their way into the pleura–two thin membranes, one on the outside of the lung and the other on the inside of the chest wall–scarring them, too, and causing pleural plaques. The more the lungs were scarred, the more they lost their elasticity–their ability to expand and take in air–and the thickening pleura further restricted the expansion of the lungs.

¶ 36     Visible scarring in the lungs implied the inhalation of a large quantity of these microscopic asbestos fibers. Compared to mesothelioma, asbestosis required a lot of exposure. It took only a little asbestos to cause mesothelioma: "One day has been sufficient both for animals and for humans to give some people cancer." By contrast, it took "relatively a lot of fiber" to cause asbestosis, the scarring of the lungs and pleura that was visible in an X-ray.

¶ 37     Frank explained:

> "I've drawn this threshold. To get the disease asbestosis you need to cross this threshold of a certain amount of exposure. Now if you say me[,] [']Dr. Frank[,] how much exposure is that[?'] I can't really tell you, I don't study that. But scientists that have [studied that question] vary greatly. You know, some say it's ten fiber years, some say it's a hundred, one even says it's a thousand to give you asbestosis. So nobody really knows the dose. But everybody agrees that it takes relatively a lot of asbestos to give you asbestosis.
>
> Q. Dr. Frank, you mentioned fiber years. I don't think we know what that is.
>
> A. It's being exposed to one fiber in the air every day for a year.
>
> Q. That would be one fiber year?
>
> A. One fiber year. So if you worked for forty years at one fiber year that would be forty fiber years lifetime.
>
> Q. So to get these higher numbers like a hundred or a thousand, you've got to be exposed to a lot more than one fiber?

A. A huge amount. And personally I think this is a silly number but somebody believes it, has testified to that. You know, and I actually think it's less than ten, but I–you know, because of things that I have seen in real life situations.

* * *

Q. *** Why is it that some people get sick and some people don't if they are all exposed to asbestos?

A. And in fact we are all exposed. Asbestos is a naturally occurring material. If you walk on the streets outside, we are all going to have a little exposure. All of us have very low levels and have therefore a very low risk of getting disease but not zero and we don't really know why. We refer to it as individual susceptibility."

### 4. *Asbestos in Pipe-Covering Insulation*

According to Frank, "all asbestos-containing products release[d] fibers," including asbestos-containing insulation, the kind that was used decades ago to insulate steam pipes. Being friable, this insulation was especially prone to release fibers. The fibers would be set adrift when the insulation was manipulated, cut, sawed, or removed. Brushing against the insulation could knock loose some fibers, which could get on clothing and then into a car and remain there permanently. Just with the passage of time, pipe-covering insulation could begin releasing fibers. If the asbestos fibers were held together in a binding medium, the product could get wet, dry out, and then "even spontaneously release fibers."

### 5. *Cumulative Exposure*

Because asbestosis was a cumulative scarring of many cells in the lungs and pleura, it was impossible to pinpoint a source of asbestos that, on a given day, caused someone to contract asbestosis. Corwin asked Frank:

"Q. I want to ask you when we look at a person's exposure and we were talking about how sometimes you're exposed and you don't even know it, is there a way scientifically to pinpoint a particular day or a particular product or a particular event that caused an exposure if the person was exposed over a period of time?

A. No. What one has to say is that the cumulative exposure, the totality of all of the exposures gave somebody disease.

***

*** [W]hat we have to say is that the cumulative exposure put the people at risk and that all of these exposures had the potential to contribute and ended up giving them their disease.

Q. So if you work in a factory for fourteen years and asbestos-containing pipe covering is in that factory and you're exposed to that because different periods of time people are working on that pipe covering, installing, removing, fixing things, like the forklift that we talked about, you–are you able to say well it was just the first day you worked there or the first year you worked there? Or would you have to implicate all those exposures over that period of time as being causes of the disease?

A. Certainly for disease like asbestosis which is not a single change in a single cell, it's multiple changes all over the lungs and the pleura, you have to say that all of the fibers on all of the days that someone was exposed would have been contributory to

their disease."

¶ 42                    E. The Testimony of Arthur B. Kremers
¶ 43                    1. *His Background With Defendant*
¶ 44    Pursuant to section 2-1102 of the Code of Civil Procedure (735 ILCS 5/2-1102 (West 2012)) and Illinois Supreme Court Rule 237(b) (eff. July 1, 2005), plaintiff called Arthur B. Kremers as an adverse witness.

¶ 45    Kremers testified that defendant now was dissolved but that when defendant was still in business, it was a company headquartered in Peoria and it sold and installed insulation. Not all the insulation in defendant's inventory contained asbestos–there was, for example, cork insulation for cold temperatures–but Kremers recalled two types of asbestos-containing insulation that defendant sold: Kaylo, manufactured by Owens-Corning Fiberglas Corporation, and Thermobestos, manufactured by Johns-Manville Corporation.

¶ 46    Kremers began working for defendant in 1969, at the invitation of the head of operations, a man named Brott, who also was Kremers' father-in-law. Kremers became vice-president of the company in 1975. In 1980, he took over some of Brott's duties because Brott was suffering from Alzheimer's disease. At that point, Kremers became the highest-ranking officer in the company. In 1983, he bought the company. He sold the company in 2000 or 2001. The company was dissolved in 2003.

¶ 47                    2. *His Ambivalence as to When*
*the Occupational Safety and Health Administration*
*Issued Its Standards on Asbestos*

¶ 48    In her direct examination, Corwin asked Kremers if, when he bought the company in 1983, he knew of the hazards of asbestos. He answered yes, and he explained that he knew about the hazards of asbestos in 1983 because that was the year, give or take a year, when the Occupational Safety and Health Administration (OSHA) issued its standards on asbestos. (Frank, by contrast, had testified that OSHA issued its emergency standards on asbestos in 1971.) Corwin asked Kremers: "Do you believe OSHA came out in 1983?" "Right in that area," he answered. "My memory is not that good. We are going back some thirty-some years, now come on." Corwin asked him if he could be "off by like ten years" as to when OSHA issued its standards on asbestos. "No," he replied.

¶ 49    Corwin's direct examination of Kremers was temporarily halted for an afternoon break. After the break, Kremers returned to the witness stand, and Corwin resumed her direct examination. She asked him if, at some point, "asbestos abatement" alerted him to the fact that asbestos was hazardous. He answered:

"A. Well [once] OSHA came out with the regulations and said, yeah.

Q. So we are back to '83?

A. '83 might not be right. I might be off ten years on that. It would be '72 or '3. I'm sorry, it's been a long time."

¶ 50    This revision prompted Corwin to ask Kremers:

"Q. *** [D]id you have any conversations with anyone during the break?

A. I talked with Cathy and Sherri, sure.

Q. Did the subject of OSHA come up?

A. She told me to think about it. That's all. So I'm sitting here looking at it and I'm thinking about it, I'm thinking that might not be right."

¶ 51 Corwin then requested permission to approach the bench, and the trial court sent the jury to the deliberation room. Corwin argued to the court that when a break was taken during a witness's testimony, it was improper for an attorney to talk with the witness about his or her testimony. Because Kremers' attorneys had done that, Corwin requested "sanctions and any other type of relief that the court deem[ed] appropriate."

¶ 52 Molchin responded:

"MS. MOLCHIN: Your Honor I did not tell my client how to testify. We did meet at break. But he has testified all throughout this proceeding, my notes, with whenever OSHA came out with regulations, that's when he knew the hazards of asbestos. I did not go out and tell him a year. He was confused about the year and I said to think about it. I didn't tell him how to testify in this case."

She insisted: "It wasn't like I went soliciting him. He knew he was confused and asked me about it. And I don't–when I said to think about it, I'm not answering the question for him."

¶ 53 It was getting near the end of the day, and the trial court declared a recess until morning so that Corwin could write a motion and a brief on this issue. The next morning, April 12, 2013, the court met with the attorneys before the jury was brought into the courtroom. The court said it had researched the matter and what little guidance it had found related to criminal cases: for example, *People v. Pendleton*, 75 Ill. App. 3d 580 (1979).

¶ 54 Corwin argued that, in a criminal case or a civil case, it was improper for an attorney to "tamper with a witness" during a recess in the midst of the witness's testimony–even if the witness were the attorney's own client. Corwin expressly disclaimed, however, any intention to request a default or a mistrial on this ground, and she declined to suggest any other specific sanction. She told the trial court:

"It's more of a contempt type issue than it is one for a sanction like default or something like that, so I mean *** it looks like something that is more within the court's purview to evaluate and come up with an appropriate response rather than the parties asking for some sort of relief on it.

***

So whatever the court wants to do about that I think is within the court's discretion to handle and I'm not asking for a mistrial and I honestly don't think, you know, Rule 219 [(Ill. S. Ct. R. 219 (eff. July 1, 2005))] sanctions and things like that apply to something like this based on my review of the case law.

So I don't know what to ask for I guess is what I'm saying, I just think it's up to the court to decide what to do."

¶ 55 The trial court noted that Molchin had a right to communicate with her client, even during a recess in her client's testimony. The court further noted "there was no order barring her from communicating with him." Molchin had not supplied Kremers with the answer to any question, and in the court's view, an exhortation "just to think about it" was not comparable to the witness-coaching in *Pendleton*. And, besides, Corwin had made it plain to the jury that talking with his lawyer during the break had induced Kremers to change his testimony. The court concluded that, to the extent this revelation damaged Kremers' credibility, that would be

- 9 -

sanction enough.

¶ 56                    3. *Ways in Which Someone Could Possibly Be Exposed*
                          *to Asbestos Fibers From Pipe-Covering Insulation*

¶ 57    In his testimony, Kremers acknowledged that the asbestos-containing pipe covering that defendant used to sell and install gave off dust during installation. Dust was generated at the jobsite when the pipe covering was cut.

¶ 58    In her direct examination of Kremers, Corwin also explored the possibility that insulation could release fibers if it were damaged after installation. She asked him:

"Q. If you have a steam pipe and it has a leak, some of the asbestos-containing pipe covering is going to become damaged and that can give off dust, right?

A. Possibly. I would think the steam[,] being steam[,] would condense and create moisture which will nullify the dust in your example.

Q. Can the steam itself erode some of the pipe covering and cause it to come off?

A. Steam is very powerful, sure.

Q. Sure. I mean when you say steam is very powerful, how much pressure is going through some of these steam pipes that you're insulating?

A. It varies tremendously.

Q. The steam has the ability to blow the asbestos insulation right off the pipe, correct?

A. It could.

Q. Okay. And of course that would create dust, right?

A. It might."

¶ 59    The thickness of the insulation, Kremers testified, was proportional to the pressure and volume of steam in the pipe. The insulation was sealed on the outside with canvas or aluminum.

¶ 60    Kremers agreed that "sometimes at jobsites," after installing asbestos-containing pipe covering, workers would use an air hose to blow the dust off their clothing. The dust would then fall to the floor and fly into the air–which, of course, was the air of everyone in that area.

¶ 61    Kremers was sure that he himself, for instance, had been exposed to asbestos dust merely by being present at jobsites where work was being done on asbestos-containing pipe covering. He doubted, however, that someone a block away from the jobsite would be exposed to asbestos fibers.

¶ 62                    4. *The Destruction of Defendant's Old Records*

¶ 63    When Kremers began working for defendant in 1969, old records were kept in the basement of the Peoria office. These records probably went back to the 1950s, and they showed the brand and manufacturer of each product defendant had sold and delivered. It was even possible, by reference to these records, to determine which employees had installed the product, because the time sheets specified the job numbers, and the job number enabled one to find the corresponding invoice in the basement.

¶ 64      As early as 1957, employees of defendant began making claims for asbestos-related diseases. The records in the basement were useful for those claims because they showed which brands of insulation the employee had installed.

¶ 65      In fact, in the early 1980s, an employee (or former employee) of defendant used those records for that very purpose. A man named Hunsinger hired an attorney, John Slevin, to represent him regarding an asbestos claim against defendant. Slevin subpoenaed records from defendant; brought along his own photocopying machine to Peoria; and spent two months in defendant's basement, copying records. At the time, Kremers was thinking of buying defendant, and he knew defendant was at risk for civil lawsuits because of its sale and installation of asbestos-containing products, which never were accompanied by any warning.

¶ 66      Sometime after Slevin photocopied the records relevant to Hunsinger's lawsuit–it could have been as short as six months afterward and it could have been as long as two years afterward (Corwin impeached Kremers with a prior statement in which he testified it was six months afterward)–Kremers had the records in the basement carted off to a recycling center, where they were ground up into pulp. He testified his reason for getting rid of the records was that defendant was running out of space. He added that destroying the records was consistent with defendant's document retention policy, under which sales contracts and invoices were to be retained for only three years. According to Kremers, this document retention policy predated 1981, and he had seen it posted in the basement.

¶ 67                           F. The Testimony of James J. Ferguson

¶ 68      James J. Ferguson was deceased. Testimony he gave in May 1995 was read to the jury.

¶ 69      Ferguson testified that in 1959 he joined the union as an insulator and that he worked in that profession until his retirement in December 1992.

¶ 70      From 1959 until sometime in the 1980s, he worked for defendant, cutting pipe covering with a handsaw and using it to repair or replace insulation on steam pipes. The jobsites were mostly in central Illinois.

¶ 71      Defendant sold Unibestos pipe covering, manufactured by Johns-Manville Corporation. It was "full of fiber" and "had asbestos in it." Ferguson worked with that brand of pipe covering "in the real early 1950s." Ferguson was asked:

     "Q. What was [Unibestos] used for?

     A. We use it for steam lines over–you want to know where?

     Q. Yeah?

     A. Eureka Williams in Bloomington."

¶ 72                           G. The Affidavit of Wesley Klein

¶ 73      Without objection by Molchin and with the trial court's permission, Corwin read to the jury from an affidavit by Wesley Klein, dated October 3, 2002. Klein also was deceased. His affidavit stated as follows (as recited by Corwin):

     "If you turn to page two, the record states, jobsite colon Eureka Company, Bloomington, Illinois, and provides the date of the early seventies.

     The source of information is Wesley Klein. The job or trade, delivered products from Sprinkmann's Peoria warehouse. New construction. No. Repair, rip out. Yes.

Outside work. Yes. Inside work. Yes. Asbestos products used by source of information. Yes. Asbestos products used around source of information. Yes. And then it lists manufacturers and brand names of products. The manufacturers on the left side include Carey Canada and Celotex and Eagle Picher and Empire Ace, H.G. Fuller and Owens Corning. The names of products include. 7-M cement, 66 cement, One-Cote cement, GPM Mastex and Kaylo."

### H. The Testimony of Gary A. Murphy

### 1. *What He Did at the Eureka Plant*

Gary A. Murphy testified that in 1959 he started working at the Eureka plant in Bloomington (the company used to be called "Eureka Williams Automatic"). He worked on the assembly line the first year. Thereafter, until his retirement from the company in 2000, he was an electrician at the Eureka plant.

### 2. *His Description of the Eureka Plant*

The Eureka plant took up an area of about 25 acres, and it consisted of several different buildings. For example, one group of buildings was called the "Thor plant," and another group of buildings was called "Area W." A long building was called the "shell plant." Other areas included the assembly area, the docking area, and the heat-treatment area.

The boiler room was next to Area W, and it contained two boilers, each of which was about 15 feet high, 15 feet wide, and 20 to 25 feet long. The boilers were covered with asbestos insulation, and steam pipes came out of the boilers. The pipes likewise were covered with asbestos insulation, which had a hard covering that became dusty over time, and the pipes went to all the buildings of the plant. There were probably 30,000 to 50,000 feet of pipe throughout the plant. The pipes fed not only steam heaters mounted on the ceiling in each of the buildings but also some equipment in the heat-treatment area.

The insulated pipes and the steam heaters were visible in all the buildings. One only had to look up.

Sometimes, when working on the heaters, Murphy would brush against the pipes, and they would leave white dust on his clothing. He was not the only employee who worked on the heaters. There was a maintenance crew of 25 to 27 people, and they also could have come into contact with asbestos pipe covering while doing plumbing or electrical work.

### 3. *The Occasional Repair or Replacement of Pipe-Covering Insulation*

Between 1962 and 1976 (plaintiff's years of employment at the Eureka plant), Murphy saw pipe-covering insulation being repaired in the Eureka plant. It was the job of the maintenance crew to repair damaged insulation–unless a piece of equipment fed by steam pipes had to be moved, and then an outside contractor would be called to replace the insulation on the relocated pipes.

Damage to insulation most often was inflicted by a forklift, and eventually, usually later rather than sooner, the maintenance crew would patch the insulation–a dusty process. Also, from time to time, a pipe leaked, damaging the insulation and necessitating a repair.

Sometimes other employees were present when the insulation was repaired. Sometimes only the maintenance personnel were there. It all depended on where the repair work was being

done. If the repair work were being done in the assembly area, for example, the maintenance crew would wait until night so as to avoid shutting down the assembly line.

¶ 86                               I. The Testimony of Daniel Powers

¶ 87        Daniel Powers testified he was a board-certified radiologist. According to Powers, he had reviewed plaintiff's X-rays and computed topography (CT) scans. They showed scarring of her lungs and pleura, and such scarring probably was caused by asbestos. He opined, to a reasonable degree of medical certainty, that plaintiff had asbestosis, a noncancerous condition.

¶ 88                               J. The Testimony of Ellis Carlton

¶ 89                               1. *His Employment by Defendant*

¶ 90        Ellis Carlton testified he began working for defendant in 1958. At first he worked in the warehouse. Then he was moved to payroll. Finally, he ended up in purchasing. By 1963 or 1964, he was the main purchaser for defendant.

¶ 91                   2. *Asbestos-Containing Insulation in Defendant's Inventory*

¶ 92        Until approximately 1976, defendant had asbestos-containing products for sale in its warehouse. To Carlton's knowledge, defendant never warned anyone of the hazards of asbestos. Defendant continued selling asbestos long after becoming aware of its hazards.

¶ 93                   3. *Defendant's Sale of Insulation to the Eureka Plant*

¶ 94        Carlton admitted that defendant had sold and delivered insulation to the Eureka plant in Bloomington. He affirmed that the products listed in Klein's affidavit contained asbestos.

¶ 95              4. *Claims Against Defendant Because of Asbestos-Related Disease*

¶ 96        In 1957, 1962, and 1964, claims were made against defendant for asbestos-related disease. During the 1970s, Carlton helped defendant respond to at least three workers' compensation claims relating to asbestos. If someone filed a workers' compensation claim, Carlton would go down to the basement and use the records to trace back where the employee had worked (that is, the jobsites) and what products the employee had worked with. Carlton also took Slevin downstairs to see the records.

¶ 97        In 1981, despite the previous claims and despite defendant's knowledge of the adverse health effects of asbestos, Brott ordered the destruction of the records in the basement. (In this respect, Carlton's testimony conflicted with Kremers' testimony. Kremer testified it was he who had ordered the destruction of the records.)

¶ 98                               K. The Testimony of Dennis Delaney

¶ 99                               1. *His Profession Before He Retired*

¶ 100        Dennis Delaney testified that, from the late 1950s until his retirement in 1991, he was a pipe cover asbestos worker. He worked out of the union hall, which linked him up with contractors, including defendant, whenever they had a job that needed done. He worked on a number of jobs for defendant in various cities in Illinois, but he never did any work in the

Eureka plant in Bloomington.

¶ 101                    2. *His Description of the Work*

¶ 102    In addition to its main warehouse in Peoria, defendant had satellite warehouses throughout Illinois, and from these warehouses, defendant delivered asbestos pipe covering to jobsites.

¶ 103    "[T]here [were] jobsites where [one] actually cut and sawed the insulation on the jobsite itself." No plastic was put up to contain the dust. Asbestos fiber would drift into the air whenever the insulation was sawed or broken or, for that matter, whenever the insulation was taken out of the box. Brushing against the insulation would leave dust on the shirt. It was very dusty material.

¶ 104    The pipe covering would be cut to the required lengths, and places had to be notched out for valves and pipe junctions. Delaney testified:

> "A. Some of it comes in two pieces, and if there's a valve or another pipe coming out of it, you have to cut the whole fork to fit and then either wire it on or we used to use canvas dipped in wheat paste and put that on it to hold it together. A lot of times we used steel bands. Depended on how big the material was and how big the pipe was. Boilers used to have flat pieces of asbestos that you put on, and they'd have like nuts welded to the metal that you wire everything on so it would stay put, and then it was a lot of dust and everything when you worked with it."

¶ 105    To insulate protruding valves so that people would not get burned on them, another asbestos product, Sprinko One Cote, was used. It resembled a box of plaster powder. The worker mixed the powder with water and molded the plaster onto the fitting or valve. When a box of Sprinko One Cote was opened and its contents were dumped into a mixing container, a cloud of dust arose.

¶ 106                    3. *Defendant's Stated Position on Asbestos*

¶ 107    Delaney never heard defendant issue any warning about the hazards of asbestos. In fact, in approximately the 1960s, when workers began learning on their own about the hazards of asbestos and when they expressed concern to defendant about the asbestos in its products, defendant responded: " [']We're not going to throw it away ***. *** [I]f you don't want to work with it, go home.['] "

¶ 108    Delaney himself had filed an asbestos lawsuit.

¶ 109                    L. Plaintiff's Testimony

¶ 110    Plaintiff testified that, from 1962 to 1976, she worked in the Eureka plant in Bloomington. Initially, she worked on the assembly line, in the main building, making sweepers. For a time, she worked in the Thor building, putting together waxers and electric brooms. There was a period when she worked in Area W. She had never worked "in the punch press or the plating area," although she had passed through those areas for other reasons. Throughout her 14 years of employment at Eureka, she was "in all the different parts of the plant for one reason or another."

¶ 111    She did not pay much attention to the pipes and pipe covering in the factory. She usually was looking down at her work, not up at the ceiling. She never saw anyone working on the

pipes or the pipe covering. She recalled, however, that sometimes forklifts would hit the pipes when stacking material too high.

¶ 112    No one in the plant ever warned her of any danger from asbestos. For a long time, she remained unaware of the danger.

¶ 113    Then, four years ago, she began having shortness of breath, so she saw her family doctor. He diagnosed her with asbestosis. This was the first time she had any inkling she had been exposed to asbestos. Before this lawsuit, she never heard of defendant.

¶ 114                      M. Plaintiff's Motion for a Directed Verdict

¶ 115    At the close of the evidence, plaintiff moved for a directed verdict on the question of whether she had asbestosis. The trial court denied the motion.

¶ 116                                    N. The Verdict

¶ 117    The jury returned a general verdict in defendant's favor and against plaintiff.

¶ 118                          O. The Motion for a New Trial

¶ 119    On July 16, 2013, after the trial court granted extensions to do so, plaintiff filed a motion for a new trial. The motion contended that plaintiff was entitled to a new trial because the court had made three errors: "(1) failure to sanction [defendant] for violating an order *in limine* during opening statement[,] (2) failure to sanction [defendant] for improperly influencing [Kremers'] testimony[,] and (3) failure to grant Plaintiff's motion for directed verdict on causation." Another reason why the motion sought a new trial was that "the verdict was against the manifest weight of the evidence."

¶ 120    On December 3, 2013, the trial court denied the motion for a new trial.

¶ 121    This appeal followed.

¶ 122                                    II. ANALYSIS

¶ 123                      A. Plaintiff's Motion for a Mistrial on the Ground of
                          Defendant's Violation of the Order *in Limine*

¶ 124    On appeal, plaintiff argues she is "entitled to a new trial because [defendant] violated an order *in limine* and Plaintiff was prejudiced." Of course, the violation to which plaintiff refers is Molchin's remark, in her opening statement to the jury, that one of plaintiff's job duties in the Eureka plant was "stuff[ing] grenades with asbestos."

¶ 125    The problem is that plaintiff never requested the declaration of a mistrial on this ground. Instead, she requested a default judgment on the issue of liability (a request the trial court denied). By requesting a default judgment on the issue of liability instead of the declaration of a mistrial, plaintiff forfeited the grenade-stuffing remark as a ground for receiving a new trial. See *McGrath v. Chicago & North Western Transportation Co.*, 190 Ill. App. 3d 276, 280 (1989); *Bauer v. Timucci*, 33 Ill. App. 3d 1051, 1057 (1975).

¶ 126    To be sure, plaintiff had reasons for refraining from moving for the declaration of a mistrial. As Corwin explained to the trial court, these reasons were twofold. The first reason was that rescheduling the trial would be burdensome to plaintiff, considering that she would have to arrange again for the attendance of her jury consultant as well as her two expert

witnesses: Frank and Powers. If, however, the necessity of rescheduling made the rule of forfeiture in *McGrath* and *Bauer* inapplicable, the rule effectively would be nonexistent, because a mistrial almost always entails rescheduling. It is true that rescheduling means additional expenses, but a criminal contempt proceeding could shift these additional expenses onto a party who deliberately sabotaged a trial. See *Helm v. Thomas*, 362 Ill. App. 3d 331, 334 (2005); *Juarez v. Commonwealth Medical Associates*, 318 Ill. App. 3d 380, 387 (2000).

¶ 127    The second reason Corwin gave opting against a mistrial was a tactical reason: rescheduling the trial would have given Molchin a chance to arrange for the attendance of defendant's own expert witnesses, whereas, if there were no mistrial, the jury would hear only from plaintiff's expert witnesses. If a party believes that, tactically, it is to the party's advantage to proceed with the trial rather than to move for the declaration of a mistrial on the basis of the opposing party's conduct, the party cannot reasonably complain, after the return of the verdict, that the conduct in question made the trial unfair. If the trial was fair enough then, it is fair enough now. A party cannot wait until after the verdict and then revise its assessment of fairness. That would be taking two bites out of the apple. *Bauer*, 33 Ill. App. 3d at 1057.

¶ 128                          B. Influencing Kremers' Testimony

¶ 129    Citing *Pendleton*, plaintiff argues that because Molchin told Kremers, during a recess in his testimony, to "think about" when OSHA issued its regulations on asbestos and because Kremers subsequently changed his answer to say that OSHA issued its regulations in the early 1970s rather than in the early 1980s, as he had testified before the recess, plaintiff deserves a new trial.

¶ 130    At the time of her contemporaneous objection, however, Corwin told the trial court she was *not* moving for a mistrial on the basis of Molchin's communication with Kremers during the recess. Therefore, again, plaintiff has forfeited this conduct as a basis for receiving a new trial. See *McGrath*, 190 Ill. App. 3d at 279; *Bauer*, 33 Ill. App. 3d at 1057.

¶ 131                     C. Plaintiff's Argument That the Verdict
                       Is Against the Manifest Weight of the Evidence

¶ 132    A party may move for a new trial on the ground that the verdict has no support in the evidence. It is up to the discretion of the trial court whether to grant the motion. *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992). Denying the motion is an abuse of discretion only if the verdict is against the manifest weight of the evidence. *Id.*; *Wiggins v. Bonsack*, 2014 IL App (5th) 130123, ¶ 25. A verdict is against the manifest weight of the evidence only if the verdict is unreasonable, arbitrary, or not based on the evidence or only if the conclusion opposite to that of the verdict is readily apparent from the evidence. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 179 (2008).

¶ 133    For the following reasons, plaintiff contends that the verdict in defendant's favor is against the manifest weight of the evidence:

> "The testimony and evidence in this case established [plaintiff] worked at Eureka from 1962-1976. She testified during those 14 years she worked all over the plant. Murphy testified that all areas of the plant were covered by asbestos containing steam pipes, and that workers would work on those pipes, creating dust. Skip Carlton testified [defendant] sold and delivered insulation to Eureka. He affirmed that the products

Klein verified under oath were delivered to Eureka were asbestos-containing products. Ferguson also testified to using Unibestos, an asbestos insulation, at Eureka. Kremers, Carlton, and Delaney all testified about the ability of asbestos dust to get in the air when asbestos insulation was installed, or when there was a leak on pipe, or the insulation was manipulated in any way. Dr. Frank[ ] testified about the ability of asbestos fibers to travel and for people to be exposed to fibers days, weeks, even years after the fibers have been introduced into an area. None of this testimony was refuted in any way by [defendant], who called no witnesses in its case."

¶ 134    The representation that plaintiff "worked all over the plant" might be understood to imply that she was stationed, at one time or another, in each area of the plant. As we understand her testimony, however, that does not appear to be the case. She testified that, during her 14-year tenure, she worked in the main building, in the Thor building, and in Area W but not that she worked in all the other areas, too. She testified that, throughout her 14 years of employment at Eureka, she was "in all the different parts of the plant for one reason or another," but that is not quite the same as saying she "worked all over the plant."

¶ 135    Otherwise, what plaintiff says in the above-quoted passage appears to be a fair statement of the evidence. Let us take it as a given that the steam pipes throughout the Eureka plant–30,000 to 50,000 feet of pipes–were covered by asbestos-containing insulation that, from time to time, the insulation got damaged in one place or the other and had to be repaired, resulting in the generation of asbestos dust; and that defendant supplied insulation with which repairs were made. Let us also take it as a given that asbestos fibers, once they are released, stay around for a long time and that they are wafted and carried along on currents of air and can be inhaled by bystanders.

¶ 136    Even so, the Eureka plant was a conglomeration of separate buildings, and it is unclear how asbestos fibers could be blown from one building to another. There appears to be no evidence that all the buildings shared the same air. We do not know what the ventilation was like in those buildings, either.

¶ 137    It is theoretically possible that plaintiff was exposed to asbestos dust if, in some building or other where she happened to be, a section of pipe insulation had been ruptured or otherwise compromised, but one can only speculate whether these exposures were frequent or intensive enough to cause or significantly contribute to her asbestosis. Frank seemed to say that trivial, occasional exposures to asbestos dust would not be enough: a threshold of exposure had to be crossed.

¶ 138    And that could be exactly what the jury found to be unproven: the crossing of the threshold. The jury could have found insufficient evidence that plaintiff was exposed to enough asbestos dust from the pipe-covering insulation, and was exposed to it often enough, to warrant a conclusion that the insulation had caused her asbestosis, which Frank characterized as "multiple changes all over the lungs and pleura." There appears to be no evidence that plaintiff ever was present, in the same building, during any repair work on insulation. More than one witness testified that the insulation typically was wrapped in canvas or some other protective covering after it was installed.

¶ 139    Granted, someone now and then passing through a building in which repair work on insulation had been done could breathe asbestos fibers, which, Frank testified, lingered indefinitely after they were released. But would this be enough to cause *asbestosis*? Frank did not seem to give a clear, consistent answer to that question. He never opined that the pipe

covering in the Eureka plant actually had caused plaintiff's asbestosis. On the one hand, he testified it took "relatively a lot of asbestos to give you asbestosis," and he was unable to say how much "relatively a lot" was. On the other hand, he testified that, when someone had asbestosis, each and every exposure to any asbestos product had to be regarded as a cause. That seems to mean that if someone, by exposure to an undisturbed asbestos product, breathed no greater quantity of asbestos fibers than the person would have breathed in a pure state of nature, say, when hiking in the mountains, that product nevertheless must be regarded as one of the causes of the person's asbestosis. The jury could have regarded that position as unreasonable (see *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 359 (1992)) while, at the same time, being confused by the paradox that a threshold of exposure ("relatively a lot") had to be crossed. There was scientific disagreement over where the threshold was (10 fiber years, 100 fiber years, or 1,000 fiber years), but wherever the threshold was, it had to be crossed.

¶ 140    In short, all plaintiff offered in the trial was speculation that her asbestosis resulted from repair work on the pipe-covering insulation in the Eureka plant, although she never saw any repair work being done on the insulation and there was no other evidence placing her near any such repair work. Or she theorized that her asbestosis resulted from damage inflicted on the insulation by a forklift, or that the canvas-wrapped insulation, as it aged, spontaneously emitted asbestos fibers. Arguably, no solid evidence lifted those theories out of the realm of speculation, out of the realm of "could." We are unable to say it is "*clearly evident*" that the asbestos-containing pipe insulation in the Eureka plant caused plaintiff's asbestosis (emphasis added) (*In re Marriage of Roepenack*, 2012 IL App (3d) 110198, ¶ 35), such that it would be impossible for any rational trier of fact to be ambivalent or unconvinced as to this factual issue (see *Kaloo v. Zoning Board of Appeals*, 274 Ill. App. 3d 927, 934 (1995)).

¶ 141                    D. Plaintiff's Motion for a Directed Verdict

¶ 142    Plaintiff argues the trial court erred by denying her motion for a directed verdict on the question of whether she had asbestosis. See *Bartolomucci v. Clarke*, 60 Ill. App. 2d 229, 234 (1965) ("That the trial court may direct a verdict in proper cases on a certain issue *** is no longer debatable."). She argues it would be impossible for any rational jury to find she did not have asbestosis.

¶ 143    For purposes of this case, though, it really does not matter that plaintiff had asbestosis if the jury was unconvinced that defendant's negligence caused it. We presume, from the general verdict, that the jury found in defendant's favor on every defense raised, including the defense of lack of causation. See *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 102 (2010). "The return of a general verdict creates a presumption that all issues of fact upon which proof was offered were found in favor of the prevailing party." *Klingler Farms, Inc. v. Effingham Equity, Inc.*, 171 Ill. App. 3d 567, 572 (1988). It may well be that the presumption is rebutted on the issue of negligence: there is no dispute that defendant delivered asbestos-containing insulation to the Eureka plant without any warning of the dangers of this product. But on the issue of causation, the presumption of which *Lazenby* speaks is unrebutted. For the reasons we have explained, the jury could have reasonably found against plaintiff on causation. Thus, it is a moot question whether the trial court should have granted plaintiff's motion for a directed verdict on the issue of whether she had asbestosis.

## E. Spoliation of Evidence

¶ 145    Plaintiff argues: "To the extent the jury may not have believed there was sufficient evidence, *although uncontradicted*, as to [defendant's] delivery and installation of asbestos products at Eureka, the only testimony at trial was that [defendant] destroyed its records at a time it already had asbestos claims made against it." (Emphasis added.)

¶ 146    As plaintiff says, however, it was "uncontradicted" that defendant had delivered asbestos-containing insulation to the Eureka plant and had installed it there. Klein and Carlton attested to that fact, and defendant called no witnesses. Given this uncontradicted testimony, the jury could have reasonably concluded that the destroyed records would have made no difference in plaintiff's case. Plaintiff had the burden of proving that, but for the destruction of these records, she would have had a reasonable probability of succeeding in her case. See *Cosgrove v. Commonwealth Edison Co.*, 315 Ill. App. 3d 651, 657 (2000). The jury could have decided that the proposition these records would have proved–that defendant had negligently delivered asbestos-containing insulation to the Eureka plant in the course of various repair and replacement jobs–actually was not in doubt and that the real problem in plaintiff's case was causation, which the records would not have addressed. In her brief, plaintiff does not explain what other significance the destroyed records would have had for her case. Therefore, the jury's verdict in defendant's favor on the claim of spoliation of evidence is not against the manifest weight of the evidence.

## III. CONCLUSION

¶ 148    For the foregoing reasons, we affirm the trial court's judgment.

¶ 149    Affirmed.